**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. PX-20-044** |
| **ALLEN LAMIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | ******* | |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The United States of America, by and through its attorney, hereby submits the Government's Memorandum in Aid of Sentencing for Allen Lamin. Defendant Allen Lamin ("Lamin") is scheduled to be sentenced on September 23, 2021, at 10:00 a.m. For the reasons set forth below, the Government submits that a sentence of **87 months in prison on each count and concurrent**, **followed by 5 years of concurrent supervised release**, is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

## BACKGROUND

### I.     <u>Factual Background</u>

The indictment and the factual allegations in the Government's open plea letter set forth the Defendant's scheme to defraud. Lamin entered United States Post Offices in Maryland and elsewhere to steal blank postal money orders from the United States Postal Service. On December 3, 2019, the Defendant entered the United States Post Office located in White Marsh, Maryland (the "White Marsh Post Office"). The Defendant, wearing a puffy red and white jacket, a red and white knit hat, and red, white, and blue Nike shoes, approached the clerk—the only one in the Post Office. (Ex. 1 at 3.) The Defendant asked for a "forwarding card" and was provided with a change

of address card.  The Defendant went around the corner to fill out the card.  (*Id.*)  The Defendant returned to the counter and said he would not be filling out the change of address card, and instead purchased a low-denomination postal money order for $20.  (*Id.*)  The postal money order sold to the Defendant had the serial number 25890043072.  (*Id.*)  The Defendant then asked if there were any extra moving boxes.  (*Id.*)  When the clerk left the counter, the Defendant proceeded to steal 65 blank money orders.  (Ex. 2 at 6.)  Following the theft, the clerk identified the Defendant in a six-person photo array.[1]  (Ex. 3 at 2.)  When law enforcement processed a jacket seized from the Defendant's residence in Gwynn Oak, Maryland, they discovered a stack of six low denomination postal money orders.  (Ex. 4.)  Within the stack of six low denomination postal money orders, law enforcement recovered the postal money order sold to the Defendant on December 3, 2019, with the serial number 25890043072.  (Ex. 5.)

Prior to the December 2019 theft, the Defendant carried out the same scheme on two separate occasions—February 7, 2019, and September 27, 2019—at the U.S. Post Office at the Prince George's Plaza in Hyattsville, Maryland (the "Prince George's Plaza Post Office"). Security camera footage from the post office shows the Defendant interacting with the clerk.  (Ex. 6; Ex. 7.)  Once the clerk is no longer visible in the video, the Defendant proceeded to reach behind the counter and steal blank postal money orders.  (Ex. 6 at 3; Ex. 7 at 2.)  On February 7, 2019, the Defendant stole 96 blank money orders.  (Ex. 2 at 1-2.)  Subsequently, on September 27, 2019, the Defendant stole 67 blank money orders while the clerk was away from the counter.  (Ex. 2 at 4-5.)

After he stole the blank postal money orders, the Defendant would use a printer to alter the stolen blank money orders so that the money orders fraudulently reflected being issued for high-dollar amounts ("the fraudulent postal money orders").  When law enforcement searched Lamin's

---

[1] The White Marsh Post Office is not equipped with security cameras.  (Ex. 19 ¶ 4.)

residence in Baltimore, Maryland, pursuant to a search warrant, they observed evidence of Lamin's unsuccessful attempts to alter the blank stolen money orders.  In a dresser drawer, law enforcement recovered a postal money order that had been altered to $900 (double printed in error) with an issue date and U.S. Post Office unit number printed on the blank stolen money order.  (Ex. 8.) Lamin would then deposit these fraudulently altered stolen money orders into financial accounts at the victim financial institutions.  The financial accounts were opened by Lamin using the names and identities of identity theft victims, with a means of identification for those individuals, or in the names of fictitious entities ("the fraudulent accounts").  As visible on surveillance footage, **LAMIN** negotiated the following stolen money orders into the following fraudulent accounts:

- Two stolen postal money orders totaling $1,900 in an account in the name of a victim, cashed on February 27, 2019, at Navy Federal in Odenton, Maryland.  (Ex. 9 at 33.)
- Four stolen postal money orders totaling $3,900 in an account in the Defendant's name, cashed on May 3, 2019, at PNC Bank in Catonsville, Maryland.  (Ex. 20 at 34, 35, 36, 49.)
- Three stolen postal money orders totaling $3,000 in an account in the name of a business, cashed on October 1, 2019, at Bank of America in Dallas, Texas. (Ex. 9 at 32.)
- Three stolen postal money orders totaling $3,000 in an account in the name of a victim, cashed on October 1, 2019, at Bank of America in Dallas, Texas.  (Ex. 9 at 46.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on October 2, 2019, at Bank of America in Baltimore, Maryland.  (Ex. 9 at 47.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on October 2, 2019, at Bank of America in Columbia, Maryland.  (Ex. 9 at 48.)
- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on October 3, 2019, at Bank of America in Baltimore, Maryland.  (Ex. 9 at 49.)
- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on October 10, 2019, at PNC Bank in Reisterstown, Maryland.  (Ex. 9 at 26-29.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on October 15, 2019, at PNC Bank in Atlanta, Georgia.  (Ex. 9 at 36.)
- One stolen postal money order totaling $1,000 in an account in the name of a business, cashed on October 15, 2019, at PNC Bank in Atlanta, Georgia.  (Ex. 9 at 37, 38.)

- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on October 16, 2019, at PNC Bank in Atlanta, Georgia.  (Ex. 9 at 54.)

- One stolen postal money order totaling $1,000 in an account in the name of a business, cashed on October 16, 2019, at PNC Bank in Atlanta, Georgia.  (Ex. 9 at 37, 38.)

- One stolen postal money order totaling $1,000 in an account in the name of a business, cashed on October 17, 2019, at PNC Bank in Atlanta, Georgia.  (Ex. 9 at 39.)

- Three stolen postal money orders totaling $3,000 in an account in the name of a victim, cashed on December 17, 2019, at PNC Bank in Durham, North Carolina.  (Ex. 9 at 2, 3.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 17, 2019, at PNC Bank in Chapel Hill, North Carolina.  (Ex. 9 at 13-15.)

- Three stolen postal money orders totaling $3,000 in an account in the name of a business, cashed on December 17, 2019, at Bank of America in Durham, North Carolina.  (Ex. 9 at 40-41.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 18, 2019, at PNC Bank in Raleigh, North Carolina.  (Ex. 9 at 16, 17.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a business, cashed on December 18, 2019, at Bank of America in Cary, North Carolina.  (Ex. 9 at 44, 45.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a business, cashed on December 18, 2019, at Bank of America in Raleigh, North Carolina.  (Ex. 9 at 43.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 19, 2019, at PNC Bank in Chapel Hill, North Carolina.  (Ex. 9 at 4, 5.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 19, 2019, at PNC Bank in Charlotte, North Carolina.  (Ex. 9 at 18, 19.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 24, 2019, at PNC Bank in Ellicott City, Maryland.  (Ex. 9 at 20, 21.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 26, 2019, at PNC Bank in Ellicott City, Maryland.  (Ex. 9 at 7-10.)

- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on December 26, 2019, at PNC Bank in Ellicott City, Maryland.  (Ex. 9 at 22.)

- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on April 9, 2020, at PNC Bank in Plano, Texas.  (Ex. 9 at 50.)
- Three stolen postal money orders totaling $3,000 in an account in the name of a victim, cashed on April 10, 2020, at PNC Bank in Plano, Texas.  (Ex. 9 at 51.)

In total, $109,400.00 in fraudulent postal money orders stolen from the Prince George's Plaza Post Office were negotiated by the Defendant and others at the victim financial institutions.  (Ex. 2 at 1-2, 4-5; Ex. 19 at 6.)  Similarly, the Defendant and others negotiated $43,980.00 in fraudulent postal money orders stolen from the White Marsh Post Office at the victim financial institutions. (Ex. 2 at 6; Ex. 19 at 6.)  Law enforcement identified these transactions based on the serial numbers on the blank stolen money orders.  (Ex. 19 ¶¶ 5, 9.)

Lamin was also captured on surveillance video negotiating several stolen money orders from the U.S. Post Office in Glenn Dale, Maryland (the "Glenn Dale Post Office"), totaling $8,000:

- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on May 23, 2019, at Bank of America in Baileys Crossroads, Virginia.  (Ex. 9 at 23, 24.)
- Two stolen postal money orders totaling $2,000 in an account in the name of a victim, cashed on May 23, 2019, at PNC Bank in Arlington, Virginia.  (Ex. 9 at 42.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on May 24, 2019, at Bank of America in Hyattsville, Maryland.  (Ex. 9 at 53.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on May 24, 2019, at Bank of America in Washington, D.C.  (Ex. 9 at 25, 26.)
- Two stolen postal money orders totaling $2,000 in an account in the name of a business, cashed on June 10, 2019, at PNC Bank in Pikesville, Maryland.  (Ex. 9 at 31, 31.)
- One stolen postal money order totaling $1,000 in an account in the name of a victim, cashed on August 9, 2019, at Bank of America in Baltimore, Maryland.  (Ex. 9 at 34, 35.)

Lamin and others negotiated $42,900.00 in fraudulent postal money orders stolen from the Glenn Dale Post Office at the victim financial institutions.  (Ex. 2 at 3; Ex. 19 at 6.)  A number of these fraudulent postal money orders were negotiated into accounts at financial institutions in the names

of victims or fictitious entities used by the Defendant—Victim 8, Victim 9, Victim 10, and Business 4.  (Ex. 2 at 3.)

When law enforcement executed search warrants at the Defendant's residences in Gwynn Oak, Maryland, and Baltimore, Maryland, they recovered money orders or receipts for the deposit of money orders that had been stolen from United States Post Offices.  As noted previously, at the Baltimore residence, law enforcement found a money order that was stolen from the U.S. Post Office in Gwynn Oak, Maryland (the "Gwynn Oak Post Office"), and altered to $900—the test run.  (Ex. 8.)  Between January 14, 2019, and February 20, 2019, $64,550.00 in fraudulent postal money orders stolen from the Gwynn Oak Post Office were negotiated at the victim financial institutions.  (Ex. 2 at 9-10; Ex. 19 at 6.)  Similar to the theft from the Glenn Dale Post Office, approximately half of the fraudulent postal money orders were negotiated into bank accounts in the names of individual victims used by the Defendant—Victim 11, Victim 12, and Victim 13. (Ex. 2 at 9-10.)

At the Gwynn Oak residence, law enforcement found a receipt for the deposit of three money orders stolen from the U.S. Post Office in Columbia, Maryland (the "Columbia Post Office"), altered to $3,000, and deposited on August 15, 2019.  (Ex. 16.)  Surveillance footage from the bank showed the Defendant depositing the money orders.  (Ex. 9 at 55, 56.)  In total, between June 20, 2019, and December 16, 2019, Lamin and others negotiated at the victim financial institutions $84,000.00 in fraudulent postal money orders stolen from the Columbia Post Office.  (Ex. 2 at 7-8; Ex. 19 at 6.)  Most of the fraudulent postal money orders were negotiated into bank accounts in the names of victims or fictitious entities used by the Defendant—Victim 4, Victim 10, Victim 14, Business 2, and Business 4.  (Ex. 2 at 7-8.)

Following law enforcement's execution of the search warrants at Lamin's residences in Maryland, the U.S. Marshals Service arrested the Defendant in Dallas, Texas, based on an arrest warrant issued in the instant case.  Pursuant to a search warrant, law enforcement retrieved text messages from the Defendant's phone.  In these text messages, on the day after law enforcement searched the Defendant's residences in Maryland, Lamin told others that he was "running form [*sic*] the law" and that law enforcement was "out to get [him]."  (Ex. 10.)  When law enforcement arrested the Defendant in Dallas, they recovered 14 blank stolen money orders from the Dallas residence.  (Ex. 11.)  These blank postal money orders had been stolen from the Industrial Post Office in Atlanta, Georgia (the "Industrial Post Office").  Law enforcement also recovered the packaging that is used to store money orders at the post office.  (Ex. 12.)  Visible in the packaging was the serial number of a blank postal money order from that batch—25425248804.  (*Id.* at 2.)  While the Defendant was fleeing law enforcement, between March 6, 2020, and April 9, 2020, $10,620.00 in fraudulent money orders stolen from the Industrial Post Office were negotiated by the Defendant and others at victim financial institutions.[2]  (Ex. 2 at 11-12.)

During the search of Lamin's Dallas residence, law enforcement found fake driver's licenses in the names of other individuals, fake driver's licenses displaying the Defendant's photograph but using a victim individual's name, a social security card in the name of a victim individual, and debit cards in the name of victim individuals (Victim 7, 15, 16, 17, and 18).  (Ex. 13.)  Law enforcement also found a "test run" stolen postal money order with a printing error.  (Ex. 11 at 15.)  Text messages on Lamin's phone showed that Lamin had asked to purchase a fraudulent driver's license in the name of another individual (Victim 7) followed by a subsequent photograph

---

[2] While evading law enforcement, the Defendant also cashed $13,980.00 in fraudulently altered postal money orders stolen from the White Marsh Post Office—between January 13, 2020, and April 10, 2020.  (Ex. 2 at 6.)

of a driver's license in the name of Victim 7, but with Lamin's photograph on the driver's license. (Ex. 14; Ex. 15.)  This driver's license was recovered in Lamin's Dallas residence.  (Ex. 13 at 2.) Law enforcement also recovered a fake New York driver's license, Social Security card, and PayPal debit card displaying the name of another victim individual (Victim 15).  (Ex. 13 at 1.) Records showed that Lamin used the identities of Victims 7 and 15 to negotiate two money orders stolen from the Industrial Post Office, totaling $2,000.  (*Compare* Ex. 13, 15 *with* Ex. 26 at 45-46.)  Lamin also had three fake North Carolina driver's licenses using Lamin's photograph and each in the name of a different identity theft victim.  (Ex. 13 at 1.)  In total, between July 10, 2019, and April 9, 2020, $47,670.72 in fraudulent money orders stolen from the Industrial Post Office were negotiated by Lamin and others at victim financial institutions.  (Ex. 2 at 11-12; Ex. 19 at 6.)

Based on this offense conduct, $392,500.72 in loss to the victim financial institutions is attributable to the Defendant and the Defendant personally cashed $71,880.00 in fraudulently altered stolen postal money orders.  (Ex. 19 at 6.)

## II.   **Procedural Background**

On February 5, 2020, the Defendant was indicted on five counts of bank fraud, in violation of 18 U.S.C. § 1344.  Lamin had his initial appearance on June 17, 2020.  A detention hearing was held on June 19, 2020, and the Defendant was detained pending trial.

On May 7, 2021, the Defendant pled guilty to the five counts in the indictment without a plea agreement.  After accepting the Defendant's plea to these counts and adjudging him guilty, the Court scheduled sentencing for August 2, 2021, and directed the U.S. Probation Office ("Probation") to prepare the Pre-Sentence Investigation Report ("PSR"), which was filed on July 9, 2021.  (ECF No. 38 ("PSR").)  Based on a joint motion by the parties, the Defendant's sentencing was rescheduled to September 23, 2021.  (ECF No. 37.)

## LEGAL STANDARD

### I.    Standard for Sentencing Enhancements

Sentencing Guidelines factors need only be established by a preponderance of the evidence.  *United States v. Battle*, 499 F.3d 315, 323 (4th Cir. 2007); *see also United States v. Williams*, 721 F. App'x 264 (4th Cir. 2018).  "It is well established that a court may, for purposes of sentencing, consider any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'"  *United States v. Mondragon*, 860 F.3d 227, 233 (4th Cir. 2017) (internal quotation marks and citation omitted); *see also United States v. Umaña*, 750 F.3d 320, 348 (4th Cir. 2014) (holding that the "Confrontation Clause does not preclude the introduction of hearsay statements" during the sentencing phase, even in capital cases); U.S.S.G. § 6A1.3(a).

### II.    Court's Determination of an Appropriate Sentence

In *United States v. Green,* 436 F.3d 449 (4th Cir. 2006), the Fourth Circuit held that after *United States v. Booker,* 543 U.S. 220 (2005), which made the Sentencing Guidelines effectively advisory, the district court is commanded to fulfill congressionally established objectives for sentencing set out in 18 U.S.C. § 3553(a): promoting respect for the law; providing just punishment for the offense; affording adequate deterrence; protecting the public from further criminal activity of the defendant; providing the defendant training, medical care, and correctional treatment; and providing restitution to victims.  *See Green,* 436 F.3d at 455; *see also United States v. Moreland,* 437 F.3d 424, 432 (4th Cir. 2006).

Thus, in conducting a sentencing, district courts must (1) calculate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the statutory sentencing factors set out in 18 U.S.C. § 3553(a)

and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guidelines range better serves the relevant statutory sentencing purposes. *See Green,* 436 F.3d at 455-56; *Moreland,* 437 F.3d at 432. The explanation of a variant sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary. *See Green,* 436 F.3d at 455-56; *United States v. Perez-Pena,* 453 F.3d 236, 241 (4th Cir. 2006). The district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances. *Green,* 436 F.3d at 456-57; *Moreland,* 437 F.3d 433.

**ARGUMENT**

I.   <u>**Application of the Sentencing Enhancements**</u>

   *a. The Defendant's Actual and Intended Losses were Greater than $250,000*

The Defendant was directly involved in cashing $71,880.00 in stolen postal money orders into fraudulent accounts, some of which were opened in the names of identity theft victims. The Defendant was captured on surveillance footage negotiating blank postal money orders—many of which he was observed stealing—into the bank accounts of individuals whose identities he had stolen as well as bank accounts in the names of fictitious businesses. (Ex. 9.) Law enforcement also recovered from the Defendant's Dallas residence false identification cards for two victims (Victim 7 and Victim 15) in whose names the Defendant negotiated fraudulent postal money orders stolen by the Defendant. (Ex. 13.)

Section 1B1.3(a)(1)(B) of the Sentencing Guidelines states that specific offense characteristics (such as the determination of loss amounts) shall be determined based on not only the acts and omissions caused by the defendant, but also "in the case of jointly undertaken criminal

activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction."  "In a case involving jointly undertaken criminal activity, loss resulting from the conduct of others is attributable to a defendant 'so long as the conduct was in furtherance of, and reasonably foreseeable in connection with the criminal activity.'" *United States v. Stewart*, 765 F. App'x 915, 919 (4th Cir. 2019) (quoting *United States v. Otuya*, 720 F.3d 183, 191 (4th Cir. 2013)).

Pursuant to § 1B1.3(a)(2), "all conduct that is 'part of the same course of conduct or common scheme or plan as the offense of conviction' constitutes relevant conduct" and "offenses are within the 'same course of conduct' when 'they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'"  *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004) (quoting U.S.S.G. § 1B1.3(a)(2) and app. n. 5(B)(ii)).  "Significant factors used to determine whether offenses are part of the same course of conduct 'include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'"  *Id.* at 313 (quoting U.S.S.G. § 1B1.3(a)(2) app. n. 5(B)(ii)).

"[T]he overarching design of the Sentencing Guidelines is aimed at sentencing defendants in substantial part for the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted."  *United States v. Agyekum*, 846 F.3d 744, 751 (4th Cir. 2017) (internal quotations omitted).  "Thus, despite the limited scope of conduct for which the defendant was convicted, he may nonetheless be sentenced more broadly for relevant conduct."

*United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014); *see also United States v. Siddons*, 660 F.3d 699, 704 (3d Cir. 2011) ("The determination of loss and other factors pertinent to a fraudulent scheme is never confined to the date of the charged mailing or wiring, but always encompasses all relevant conduct that was part of the same course of conduct or common scheme or plan.")

Additionally, the Sentencing Guidelines require that, for purposes of determining the offense level for property and financial crimes, the loss is the greater of actual or intended loss, U.S.S.G. § 2B1.1, cmt. n.3(A), and actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," *id*. Application Note 3(C) of the Sentencing Guidelines states that the "court need only make a reasonable estimate of the loss" and that the "estimate of the loss shall be based on available information."

The evidence shows that the Defendant stole postal money orders from the White Marsh Post Office and the Prince George's Plaza Post Office. The teller's description of the Defendant and the positive identification of the Defendant in a photographic array shortly after the theft are sufficient to establish that the Defendant stole the postal money orders from the White Marsh Post Office. (Ex. 1; 3.) Similarly, the surveillance videos showing the Defendant reaching over the register to steal blank postal money orders at the Prince George's Plaza Post Office on two separate occasions prove the Defendant's theft. (Ex. 6; 7.)

The losses that accrued when the blank postal money orders that the Defendant had stolen were fraudulently altered and negotiated at victim financial institutions are within the scope of the criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. A total of $109,400.00 in fraudulent stolen money orders from the Prince George's Plaza Post Office were deposited by the Defendant and others. (Ex. 19 at 6.) Likewise, $43,980.00 in fraudulent stolen money orders from the White Marsh Post Office were

negotiated by the Defendant and others. (Ex. 19 at 6.) These blank stolen money orders were fraudulently altered and deposited in much the same way that the Defendant undertook his crimes, showing that these fraudulent money orders deposited by other individuals were within the scope of the criminal activity and in furtherance of that criminal activity. Further evidencing this, several the fraudulent postal money orders were deposited into fraudulent accounts in the names of the same victims and businesses used by the Defendant when he deposited his fraudulently altered stolen postal money orders. Having stolen the blank postal money orders, the Defendant had these blank money orders in his possession, and it is axiomatic that if others deposited these money orders the Defendant gave them the stolen money orders. By providing the blank stolen postal money orders to others, the Defendant facilitated the deposit of these fraudulent money orders at victim financial institutions. Providing these blank postal money orders to others and having them effectuate the very same scheme, the acts of the Defendant's coconspirators were in furtherance of the scheme and the resulting losses to the victim financial institutions were reasonably foreseeable to the Defendant. *See United States v. Williams*, 365 F. App'x 478, 479 (4th Cir. 2010) (finding that attributing to defendant the total loss and number of victims was appropriate where the defendant "introduced other individuals to the counterfeit check-cashing scheme and that she was aware of the other participants.")

The evidence also shows that the Defendant was responsible for depositing a number of fraudulently altered stolen postal money orders from the Glenn Dale, Columbia, and Gwynn Oak Post Offices. More than half of the blank postal money orders stolen from these post offices are directly attributable to Lamin as they were either: (a) deposited by Lamin as confirmed by surveillance footage, or (b) deposited into fraudulent accounts in the names of individual victims or fictitious entities used by Lamin. The Defendant also had in his possession a test run stolen

postal money order from the Gwynn Oak Post Office.  (Ex. 8.)  The postal money orders attributable to Lamin were interspersed throughout the sets of blank postal money orders stolen from the respective Post Offices.  The Defendant's access to blank postal money orders throughout the series of postal money orders stolen from the Glenn Dale, Columbia, and Gwynn Oak Post Offices evidences that the Defendant had access to the full sets of postal money orders stolen from these Post Offices.  Either having stolen the blank postal money orders from these Post Offices or having divided the stolen blank postal money orders with others, it was again reasonably foreseeable to the Defendant that these stolen blank postal money orders would be fraudulently altered and deposited or cashed at victim financial institutions in furtherance of the very same scheme the Defendant was committing.  *See United States v. Discua*, 189 F. App'x 202, 206 (4th Cir. 2006) (finding that based on defendant's position he "could have surmised the scope of the conspiracy" and "could have reasonably foreseen [] the amount of loss"); *see also Otuya*, 720 F.3d at 191 (affirming district determination of loss where the defendant personally perpetrated the underlying fraudulent transactions or "because he had a close working connection with the conspirators who did.")  Accordingly, the $42,900.00 in fraudulent stolen money orders from the Glenn Dale Post Office, $84,000.00 from the Columbia Post Office, and $64,550.00 from the Gwynn Oak Post Office that were negotiated by the Defendant and others are attributable to the Defendant as part of his offense conduct.

Finally, as previously discussed, when law enforcement conducted a search of the Defendant's residence in Dallas, Texas, they recovered the packaging used to store blank postal money orders, along with a blank money order in this packaging.  (Ex. 12.)  The Defendant also had in his residence blank postal money orders with serial numbers that traced back to this packaging, which was from the Industrial Post Office, and a test run money order.  (Ex. 11.)  From

14

this package of postal money orders, forty-nine stolen postal money orders were fraudulently altered and deposited at victim financial institutions. (Ex. 2 at 11-12.) Two of these stolen postal money orders were deposited in the names of Victim 7 and Victim 15, respectively, whose false identifications the Defendant had at his Dallas residence and on his phone. (*Compare* Ex. 2 at 11-12 *with* Ex. 13; Ex. 14.) Based on this evidence, including that U.S. Post Offices do not sell blank postal money orders and do not provide the packaging used to store blank postal money orders to customers, the evidence shows that the Defendant stole these postal money orders. (See Ex. 19 ¶ 3.) The Government therefore submits that the Defendant had possession of the blank postal money orders stolen from the Industrial Post Office and either deposited these stolen postal money orders himself or provided them to others. Given his role, it was reasonably foreseeable to the Defendant that these stolen blank postal money orders would be deposited at victim financial institutions in furtherance of the scheme—just as the Defendant did for the fourteen months he deposited his own fraudulently altered postal money orders. In total, $47,670.72 in fraudulent stolen postal money orders from the Industrial Post Office were deposited by the Defendant and others.

Accordingly, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), a 12-level enhancement applies because the intended or actual loss attributable to the Defendant is $392,500.72. *See United States v. Grant*, 431 F.3d 760, 762 (2005) (stating that it is proper to "use[] the full face value of a check to calculate intended loss.")

   b.  *The Defendant's Offense Involved 10 or More Victims*

The evidence shows that the Defendant deposited stolen and fraudulently altered postal money orders into fraudulent accounts held in the names of eleven different individual victims.

The Defendant was captured on bank surveillance footage depositing the stolen postal money orders into accounts held in the names of the eleven individual victims:

- Victim 1 (Ex. 9 at 33);
- Victim 2 (Ex. 9 at 46, 47, 48, 49);
- Victim 3 (Ex. 9 at 27-29);
- Victim 4 (Ex. 9 at 54);
- Victim 5 (Ex. 9 at 2-10);
- Victim 6 (Ex. 9 at 13-22);
- Victim 7 (Ex. 9 at 50, 51);
- Victim 8 (Ex. 9 at 23-26, 53);
- Victim 9 (Ex. 9 at 52);
- Victim 10 (Ex. 9 at 34, 35); and
- Victim 14 (Ex. 9 at 55, 56).

Since the offense conduct directly attributable to the Defendant is sufficient to show that the Defendant's criminal conduct involved ten or more victims, the 2-level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(2)(A). *See United States v. Melchor*, 580 F. App'x 173, 174 (4th Cir. 2014) (stating that pursuant to U.S.S.G. § 2B1.1(b)(2) cmt. n.4(E) "'victim' means . . . any individual whose means of identification was used unlawfully or without authority" and affirming district court "considering the individuals whose identifying information was stolen by [the defendant] to be victims for purposes of the Guidelines.")

    *c.   The Defendant's Offense Involved Sophisticated Means*

"Section 2B1.1(b)(10)(C) directs the sentencing court to increase the offense level by two levels if 'the offense otherwise involved sophisticated means.'" *United States v. Wolf*, 860 F.3d 175, 199 (4th Cir. 2017) (quoting USSG § 2B1.1(b)(10)(C)). Sophisticated means "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n. 9(B). By way of example, the Sentencing

Guidelines states that the sophisticated-means enhancement applies where the offense conduct includes "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts.'" *Id.* "The enhancement applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). "A sentencing court should consider the cumulative impact of the criminal conduct, for the 'total scheme' may be 'sophisticated in the way all the steps were linked together.'" *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).

The Defendant's use of accounts in the names of fictitious entities to deposit stolen fraudulently altered postal money orders is alone sufficient to apply this 2-level enhancement, showing that he "intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). *See* (Ex. 9 at 30-32, 37-45); *United States v. Chisholm*, 652 F. App'x 196, 199 (4th Cir. 2016) (finding that where the defendant "took efforts at concealment that went beyond the concealment inherent in fraud" the district court did not err in applying the enhancement).

The scheme as a whole was sophisticated as well. The Defendant used printers to alter and forge stolen postal money orders with sufficient detail that they would be accepted by unsuspecting financial institutions. Such forging included affixing issue dates, U.S. Post Office unit numbers, and issue amounts, making these fraudulently altered postal money orders appear legitimate. (*See* Ex. 8; Ex. 19 n. 1.) The intricate nature of this offense conduct rises to the level of "sophisticated means." *See United States v. Balde*, 616 F. App'x 578, 584 (4th Cir. 2015) (finding that the sophisticated means enhancement applied where fraudulent purchases were disguised by encoding cards with stolen credit card number to make them appear as legitimate transactions.) The forging

of numerous stolen postal money orders repeatedly and with such detail as well as their subsequent deposit in various accounts in the names of identity theft victims and fictitious entities at the victim financial institutions concealed the Defendant's crimes and made them difficult to detect—elements of a complex scheme. *See id.*; *See United States v. Williams*, No. 4:14-CR-38-FL, 2014 WL 7369836, at *3 (E.D.N.C. Dec. 29, 2014) (stating that "[f]orging signatures, opening false accounts, and taking steps to make a crime difficult to detect are all elements of a complex scheme"); *see also United States v. Vysniauskas*, 593 F. App'x 518, 531-32 (6th Cir. 2015) (noting that the "repeated use of false identities in an extensive and repetitive scheme supports" a sophisticated means enhancement, "even if 'the information used was not itself unduly complex or difficult to obtain'"); *United States v. Adejumo*, 772 F.3d 513, 531 (8th Cir. 2014) (affirming district court's application of sophisticated means enhancement where defendant had identification documents, specifically created with his picture on them, and the conduct was "repetitive in nature.")  All of this shows a level of sophistication and complexity that warrants the 2-level enhancement for engaging in conduct constituting sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

### d.  *Final Offense Level and Guidelines Range*

Based on the above, the Government, Probation, and the Defendant agree that the base offense level is **7**, pursuant to U.S.S.G. § 2B1.1(a)(1).  As set forth above, a **12**-level increase applies, pursuant to § 2B1.1(b)(1)(G), because the amount of loss involved in the offense was more than $250,000 but not more than $550,000; a **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims; and a **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means.  Probation agrees with these enhancements.  The offense level is decreased by **2**-levels because of the

Defendant's prompt recognition and affirmative acceptance of responsibility, U.S.S.G. § 3E1.1(a), and the Government will move for an additional **1**-level decrease based on the Defendant's timely notification of his intention to enter a plea of guilty, U.S.S.G. § 3E1.1(b).  Accordingly, the Defendant's final offense level is **20** and the Defendant has a criminal history category **VI** based on 21 criminal history points.  The Sentencing Guidelines range is **70** to **87** months.

## II.     Relevant Sentencing Considerations Under 18 U.S.C. § 3553(a)

The Defendant's extensive criminal history of fraud, his committing the instant offense while on supervised release for aggravated identity theft and bank fraud, the length, breadth, and scope of the Defendant's criminal conduct, and the Defendant's flight from law enforcement and continued engagement in this criminal scheme after he knew that law enforcement was searching his residences and seeking his arrest, demonstrates that a sentence at the top of the Sentencing Guidelines range is necessary for this Defendant in order to satisfy the factors set forth under 18 U.S.C. § 3553(a).

### a.  The Defendant's Extensive Criminal History of Fraud

The Defendant's adult criminal convictions result in a criminal history score of 21—forty-four convictions over the past fourteen years for offenses that include theft, using a stolen or counterfeit check, driving with a suspended license, providing false information to the police, check forgery, domestic assault, damage to property, bank fraud, and aggravated identity theft. This criminal history evidences the Defendant's lifetime of recidivist and fraudulent conduct, starting at the age of eighteen.

### i.  The Defendant's Convictions in Minnesota

At eighteen, the Defendant had two misdemeanor charges for theft, which resulted in convictions.  (PSR ¶¶ 54, 56.)  Approximately four months after his second misdemeanor theft

charge, the Defendant was charged with, and subsequently convicted for, check forgery.  (PSR ¶ 60.)  From here, the Defendant continued to engage in more fraud, including a 2008 conviction for providing a fake driver's license to a police officer, (PSR ¶ 63), and a 2009 conviction for check forgery at the age of 21, (PSR ¶ 77).  The PSR discusses the facts of the 2009 offense for which the Defendant was sentenced to 120 days incarceration, stayed, and 10 years of probation on October 28, 2009.  The Defendant, along with an accomplice, attempted to commit bank fraud by presenting a bank teller with a check in the amount of $8,245.00, which was drawn on a victim's bank account.  When the teller determined that the victim's bank account had been closed earlier that day, the Defendant attempted to leave the scene.  When law enforcement apprehended the Defendant in his vehicle, they recovered bank deposit slips, two credit cards in the name of another victim, a pay stub for another victim and a check payable to that victim from a cleaning business, seven blank Minnesota Driver's license applications, and a mechanical date stamper.  (*Id.*)  This fact pattern and such evidence of the tools of the Defendant's fraudulent trade would be repeated *ad nauseum* over his litany of fraud-related convictions for the next ten years—leading up to the instant case.

Again in 2009, a month after his prior arrest, the Defendant was charged with Possession or Sale of Stolen or Counterfeit Checks.  (PSR ¶ 81.)  On November 17, 2009, the Defendant was sentenced to 1 year and 1 day incarceration, stayed for 3 years, credit for 124 days time served, and 3 years probation.  (*Id.*)  The facts of the conviction again show the Defendant using a check with an illegible signature to withdraw funds from a victim's bank account and deposit the money—on video surveillance—into another victim's account.  (*Id.*)  When law enforcement questioned the victim whose account was used to deposit the funds, the victim stated that the

Defendant "told her he could assist with financial problems" and in exchange for providing her bank account information "the victim received $2,000 and the defendant kept $5,000." (*Id.*)

On August 27, 2010, the Defendant was sentenced to 13 months incarceration, stayed for 5 years, 90 days incarceration, 13 days credit for time served, and 5 years probation for check forgery. (PSR ¶ 84.) This time, the Defendant went to a department store and presented a check drawn on the account of the victim, with a fraudulent state picture identification with the name of the victim, and a bank check card bearing the name of the identity theft victim. (*Id.*) A month after the Defendant was arrested for this crime, the Defendant was again arrested on February 16, 2020, for Forgery-Falsely Make or Alter Membership Card. (PSR ¶ 85.) On January 28, 2011, the Defendant was sentenced to 17 months incarceration, stayed for 10 years, 10 years probation with condition of 144 days incarceration, credit for 144 days served. (*Id.*) For both of these crimes, the Defendant violated probation and was sentenced to additional time. (PSR ¶¶ 84, 85.)

Four months later, on April 19, 2011, the Defendant was arrested for Give Peace Officer False Name—again using a false identification. (PSR ¶ 90.) On December 4, 2012, the Defendant was sentenced to 90 days incarceration, stayed for 1 year, and 1 year probation. (*Id.*) On August 19, 2013, the Defendant was sentenced to 17 months incarceration, stayed for 3 years, 120 days incarceration, 120 days credit for time served, 3 years probation for Theft by Swindle. (PSR ¶ 91.) The Defendant had insured two vehicles using the business checking account of a victim.

### ii. *The Defendant's Convictions in the DMV-area*

Following his string of fraud convictions in Minnesota, the Defendant was convicted in this Court for (i) Giving False Name to Police and (ii) Giving False Information, among other crimes, on August 19, 2015. (PSR ¶ 93.) After having been pulled over for a traffic violation, the Defendant had provided a false identification to the U.S. Park Police. (*Id.*)

While this case was pending, on July 8, 2015, the Defendant pled guilty to Aggravated Identity Theft and Bank Fraud in the U.S. District Court for the Eastern District of Virginia.  (PSR ¶ 94.)  As set forth in the stipulated facts, the Defendant used a victim's identity to defraud several financial institutions, including a number of victim financial institutions who were defrauded in this case.  (*Id.*)  As he did in his 2009 conviction for Possession or Sale of Stolen or Counterfeit Checks, the Defendant recruited individuals to provide their personal identification information ("PII") in exchange for a cash payment.  Once the Defendant had control of the individuals' bank account information, the Defendant would deposit fraudulent checks into the bank accounts.  (*Id.*)  The Defendant would then purchase postal money orders or make cash withdrawals before the account was frozen.  When the Defendant was arrested for drunk driving by the U.S. Park Police, law enforcement recovered $2,000 in cash and two $1,000 postal money orders purchased using an account taken over by the Defendant.  The Defendant had used the false identification he had provided to law enforcement to negotiate a postal money orders for $1,000 and $800, respectively, and to open a bank account.  (*Id.*)  The Defendant then proceeded to deposit fraudulently obtained postal money orders into this bank account over multiple days.  The Defendant also used the debit card associated with the bank account to make purchases.  For his offense conduct, the Defendant was sentenced to a total of 54 months incarceration as well as 5 years of supervised release. Following a motion for downward departure, the Defendant's sentence was reduced to 27 months. (*Id.*)

    *b.  The Defendant's Commission of this Crime While on Supervised Release*

The Defendant began his term of supervised release on September 11, 2017.  (PSR ¶ 94.) In less than eighteen months, the Defendant had begun his offense conduct in this case—starting with his theft of blank postal money orders from the Prince George's Plaza Post Office on February

7, 2019, and his alteration of and deposit of these fraudulent postal money orders shortly thereafter. The Defendant's resumption of his criminal conduct is in lockstep with his history of committing offenses while on court ordered probation.  (PSR ¶¶ 77, 84, 85, 91.)

  *c.*  *The Nature and Circumstances of the Defendant's Offense*

  The Government's sentencing memorandum sets out in detail—with the underlying evidence—the Defendant's approximately eighteen-months long engagement in a scheme to steal postal money orders, impersonate individual victims, and defraud financial institutions out of at least $71,880.00 in fraudulent postal money orders cashed by this Defendant.

  To bring this criminal scheme to fruition, the Defendant engaged in every tool of the trade that he used in his numerous prior fraud convictions.  Surveillance images, eyewitnesses, and evidence recovered from the Defendant's residences show that the Defendant engaged in theft by stealing stacks of blank postal money orders from U.S. Post Offices in Maryland and Georgia. Evidence recovered pursuant to search warrants demonstrates that the Defendant then altered the blank stolen postal money orders to reflect them being issued for high dollar amounts, including by affixing issue dates and post office codes on the postal money orders so that they would be accepted by victim financial institutions.  Following this, the Defendant opened or took control of accounts in the names and identities of individual victims as well as fictitious entities to then deposit the stolen money orders personally into these fraudulent accounts.

  The Defendant's criminal conduct was not limited solely to his own actions.  Many of the blank postal money orders in the stacks stolen by the Defendant were fraudulently altered and deposited at victim financial institutions.  In many cases, accounts opened in the name of identity theft victims or in the names of fictitious businesses—that were used by the Defendant himself as evidenced in bank surveillance footage—were used to deposit the fraudulent postal money orders.

The total losses to the victim financial institutions attributable to the Defendant's theft of blank postal money orders from the Prince George's Plaza Post Office, the White Marsh Post Office, the Glenn Dale Post Office, the Gwynn Oak Post Office, the Columbia Post Office, and the Industrial Post Office is $392,500.72.  Showing a clear escalation in his criminal conduct, the harm caused by the Defendant from this scheme is greater by an order of magnitude than any of his prior criminal activity.

### d. The Defendant's Flight from Law Enforcement and Continued Engagement in this Offense

Law enforcement was unable to locate Lamin in Maryland when they executed search warrants at Lamin's Maryland residences, one of which was the residence the Defendant had on file with Probation.  The search warrants were executed on January 22, 2020, and on the same day Lamin texted an acquaintance that he was "running form [*sic*] the law." (Ex. 10.)  The Defendant never informed his probation officer that he went to Texas, because he knew that law enforcement was executing a search warrant at his home.  The Defendant had an image of the search and seizure warrant for the Gwynn Oak, Maryland, residence on his phone, dated March 6, 2020.  (Ex. 18.)  As previously described, at the Dallas residence, law enforcement found fraudulent identifications using Lamin's photograph and the names and identifiers of identity theft victims.  In addition, law enforcement found financial documents and debit cards in the names of the identity theft victims.  Law enforcement also found 14 blank stolen postal money orders from the Industrial Post Office.

The fact that law enforcement was after Lamin did not dissuade the Defendant from continuing to engage in his fraudulent scheme.  At least twenty-three postal money orders—from the White Marsh Post Office and the Industrial Post Office—were deposited after January 22, 2020.  Between February and April 2020, fraudulent postal money orders were deposited in bank accounts in the names of Victims 5, 7, and 15 in the amount of $13,980.  (Ex. 23 at 1-9, 29-33; Ex.

26 at 45-46.)  As previously noted, when law enforcement searched Lamin's Dallas residence they recovered driver's licenses for Victims 7 and 15.

  e.  *Necessity of the Requested Sentence*

The nature and circumstances of the offense as well as the history and characteristics of this Defendant's incredibly long criminal history necessitate a sentence at the top of the Sentencing Guidelines to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of this Defendant.

The Defendant's instant offense is more serious than any he has previously committed in his long criminal history.  The year-and-a-half long scheme perpetuated by the Defendant eclipses his prior offenses, including his prior federal conviction in the Eastern District of Virginia. Similarly, the number of victims (both individual and financial), amount of loss, and the variety of criminal acts that the Defendant undertook to commit this offense—theft, forgery, identity theft, and bank fraud—evidence the seriousness of the offense.  Accordingly, a sentence at the top of the Sentencing Guidelines is the only adequate sentence to provide just punishment for this offense.

The Government is hopeful that such a stiff sentence will promote respect for the law with this Defendant and afford adequate deterrence, as he once again stands before the Court having shown little respect for the law or the consequences that accompany his repeated decision to violate it.  The Government acknowledges the Defendant's incredibly tough childhood that led to his immigration to the United States, as detailed in the PSR.  However, that does not mitigate the Defendant's long history of continued and escalating recidivism—having been given every

opportunity to turn his life around over the past fifteen years.[3]  As set forth above, the Defendant has received significant breaks in his numerous past criminal convictions—sentences that have been largely suspended.  Each time, the Defendant has thumbed his nose at the Court, continuing to engage in crime while on probation.  This instance is no different.  The Defendant committed the instant offense while on supervised release for a prior federal crime.  A sentence at the high end of the applicable Guidelines would be approximately three times more than the Defendant has ever previously served.  Such a sentence of 87 months is entirely appropriate based on the significantly escalated seriousness of the offense—the Government hopes an adequate deterrence to this Defendant.  However, should such a stiff sentence not provide the disincentive for this Defendant to not reengage in recidivism, then the longest possible sentence is the only way to protect the public from his further crimes.

III.   **Forfeiture Judgment and Restitution**

    *a.  Forfeiture Judgment in the Amount of the Defendant's Gross Proceeds*

The Government asks the Court to incorporate the motion for forfeiture of property and preliminary order of forfeiture into the sentencing proceeding.

---

[3] The Government anticipates that the Defendant may argue that his contraction of COVID-19 during his pretrial detention or his detention during the pandemic merits a lower sentence.  The Defendant's own choices leading up to this offense—his long history of fraud and his decision to flee from law enforcement during the pandemic—necessitated his incarceration, as (then) U.S. Magistrate Judge Boardman determined.  (ECF No. 30.)  Notwithstanding this, the Defendant's medical records show that he was found "asymptomatic" on January 24, 2021, which continued until the Defendant was released from isolation.  (ECF No. 26 at 3-29.)  On the day the Defendant was confirmed to have COVID-19, he denied having "chest pain, head ache, [shortness of breath], fever, chills, cough, muscle ache, or loss [of] taste or smell."  (*Id.* at 35.  *But see* PSR ¶ 132.)  Neither the Defendant's contraction of COVID-19 nor his pretrial detention during a pandemic diminishes the significant harm caused by this Defendant—a harm for which the only just punishment is a top of the Guidelines sentence.

*b.  Restitution to the Victim Financial Institutions is Appropriate in this Case*

Additionally, under the Mandatory Victims Restitution Act ("MVRA"), a defendant is required to make full restitution for offenses in which an identifiable victim has suffered a pecuniary loss.  *Id.* § 3663A(c)(1)(B).  The Government must demonstrate the victim's loss by a preponderance of the evidence, *Id.* § 3664(a), (e), and the MVRA limits any award "to the victim's 'actual losses.'"  *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (stating that "restitution in a criminal copyright case must reflect the victim's actual losses, not the defendant's gain"); *see also United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (finding that "defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations.")  "Calculating loss under the MVRA must be done with 'some precision,' although 'exact precision' is not required."  *United States v. Rakhamimov*, No. WDQ-13-0662, 2015 WL 6739579, at *4 (D. Md. Nov. 2, 2015) (quoting *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015)).  "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." *United States v. Mejia*, 326 F. App'x 710, 712 (4th Cir. 2009).

The above-described offense conduct is sufficient to establish that these victim financial institutions are a "victim" of the Defendant's conduct under the MVRA.  18 U.S.C. § 3663A(a)(2); (*see generally* Ex. 2).  In advance of the Defendant's sentencing, the Government anticipates submitting restitution requests with actual losses from the victim financial institutions where the Defendant or those he conspired with deposited the fraudulently altered stolen postal money orders.[4]  (Exs. 20-26.)

---

[4] To date, Bank of America and PNC Bank have submitted victim impact statements claiming actual losses in the amount of $54,526.87 and $73,345.32, respectively.  (Exs. 17, 27.)

**CONCLUSION**

For the foregoing reasons, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of **87 months in prison, followed by 5 years of supervised release**, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:    /s/
Rajeev R. Raghavan
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on September 2, 2021, and thus served upon defense counsel.

_____/s/_____
Rajeev R. Raghavan
Assistant United States Attorney