IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | CRIMINAL NO. PX-20-044 |
| ALLEN LAMIN, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | ****** | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, hereby submits the Government's Response to Defendant Allen Lamin's Sentencing Memorandum. As set forth in the Government's sentencing memorandum and below, the Government submits that a sentence of **87 months in prison on each count and concurrent**, **followed by 5 years of concurrent supervised release**, is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

ARGUMENT

I. **The Defendant's Offense Involved at Least 7 Real Victims and at More Than Ten Victim Financial Institutions**

In its sentencing memorandum, the Government set forth eleven identities used by the Defendant when he deposited fraudulent postal money orders into fraudulent accounts held in the names of each of these identities. Law enforcement was able to determine seven real individual victims who had their identities used by Lamin as part of his scheme. (*See generally* Ex. 30.) The following victims had their names, social security numbers, date of birth, or other personal identifying information stolen in order to open bank accounts at the victim financial institutions:

- Victim 2 (Ex. 9 at 46-49; Ex. 28 at 1; Ex. 29 at 1);

- Victim 3 (Ex. 9 at 27-29; Ex. 28 at 2; Ex. 29 at 2, 3);
- Victim 4 (Ex. 9 at 54; Ex. 28 at 3; Ex. 29 at 4-6);
- Victim 5 (Ex. 9 at 2-10; Ex. 28 at 4; Ex. 29 at 7-17);
- Victim 8 (Ex. 9 at 23-26, 53; Ex. 28 at 5; Ex. 29 at 18-21);
- Victim 9 (Ex. 9 at 52; Ex. 28 at 6; Ex. 29 at 22-26);
- Victim 14 (Ex. 9 at 55, 56; Ex. 28 at 7; Ex. 29 at 27-31).

Lamin was captured on surveillance footage depositing fraudulently altered postal money orders into bank accounts opened using the personal identifying information for each of these real individual victims. *See U.S.S.G.* § 2B1.1(b)(2) cmt. n.4(E) (stating that "victim" means "any individual whose means of identification was used unlawfully or without authority"); *United States v. Melchor*, 580 F. App'x 173, 175 (4th Cir. 2014) (finding that district court did not err by "considering the individuals who identifying information was stolen to be victims for purposes of the Guidelines.")

The Defendant's text asking for the creation of a fake driver's license in the name of Victim 7 demonstrates his *modus operandi*. (ECF No. 45-5 (Ex. 14).) Asking a co-conspirator to create a fraudulent driver's license, the Defendant provided Victim 7's name, noted that the victim was "form [*sic*] NY," and asked for a Texas driver's license to be created in Victim 7's name with Lamin's photograph. (*Id.*) The fraudulent account opened by the Defendant in Victim 7's name at PNC Bank used the same address in Dallas, Texas, and a Texas driver's license, as requested by the Defendant. (Ex. 34.) The text message from Lamin and the bank account opened in Victim 7's name shows the Defendant's pattern and practice—using the identities of others unlawfully and without their authority.[1] At the Defendant's residence, law enforcement also found a Georgia driver's license in Victim 7's name. (ECF No. 45-4 (Ex. 13) at 2.)

---

[1] The mismatch or use of partial fictitious personal identifying information (including different dates of birth and addresses) to open the fraudulent accounts in the real victim's names

Separately, as set forth in the Application note for § 2B1.1, a "victim" means "any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1 cmt. n. 1. A "person" includes "individuals, corporations, [and] companies." *Id.* "The bar for actual loss is not high . . . . [M]onetary harm can include even the expenditure of time and money to regain misappropriated funds and replace compromised bank accounts." *United States v. Kelliher*, 846 F. App'x 101, 106 (3d Cir. 2021) (omitting internal quotations and citations). As financial institutions who suffered a loss directly due to the Defendant's fraudulent conduct, PNC Bank, Bank of America, and Navy Federal constitute victims under the Guidelines. *See United States v. Chew*, 804 F. App'x 492, 495 (9th Cir. 2020) (finding that district could properly counted both an individual and the individual's bank as victims "because both the account holder and the bank suffered 'distinct wrongs.'") However, the definition of "victim" is not limited to only "actual loss" caused by the Defendant and includes the entirety of the offense conduct attributable to a defendant. "[I]n order to be counted as a victim, a person must have sustained a loss that is monetary or that otherwise is readily measurable in money *and* that loss must be included in the loss calculation." *United States v. Klassy*, 409 F. App'x 169, 172 (9th Cir. 2011) (quotations omitted and emphasis in original); *see also Chew*, 804 F. App'x at 495 (finding that "district court properly included eight mail theft victims in the number of victims because [defendant's] uncharged act of mail theft was part of the same course of conduct.") As set forth in the Government's sentencing memorandum, fraudulent postal money orders stolen from the Prince George's Plaza Post Office, White Marsh Post Office, Glenn Dale Post Office, Columbia Post Office, Gwynn Oak Post Office, and Industrial Post Office and deposited into fraudulent accounts at the victim financial institutions are attributable to the

---

demonstrates that these victims were not setting up these accounts themselves. (*Compare* Ex. 28 *with* Ex. 29.)

3

Defendant as part of his offense conduct and included in his loss calculation. Accordingly, Wells Fargo, Sandy Spring Bank, Citibank, M&T Bank, Capital One, TD Bank, BBVA Compass Bank, SunTrust, First Essex Bank, HSBC, and Metro Medical Credit Union are all victims of this Defendant—raising the number of real individual victims and entities that suffered harm from the Defendant's offense conduct to well more than ten.

**II.     The Government Can Rely on the Evidence of Photographic Array and Law Enforcement Testimony at Sentencing**

The Government reserves its right to have the eyewitness teller testify at sentencing regarding how the Defendant came to her post office on December 3, 2019, sent the teller to the back on a ruse, and proceeded to steal blank postal money orders from below the till. Notwithstanding this, the Government submits that the testimony of a law enforcement officer who conducted the lineup is sufficient to establish by a preponderance of the evidence that the Defendant committed the blank postal money orders theft and that the photograph array was not impermissibly suggestive.

"When a witness identifies the defendant in a police-organized photo lineup, . . . the identification should be suppressed only where 'the photographic identification procedure was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (quoting *Simmons v. United States*, 390 U.S. 377, 384-85 (1968)). "[E]ven where unnecessarily suggestive procedures are used, due process does not require exclusion of the evidence if the 'identification was sufficiently reliable to preclude the substantial likelihood of misidentification.'" *United States v. Saint Louis*, 889 F.3d 145, 152 (4th Cir. 2018). Accordingly, to exclude photo identification evidence, a defendant must satisfy "two steps: (1) 'the defendant must show that the photo identification procedure was impermissibly suggestive,' and (2) 'if the defendant meets this

4

burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances.'" *Id.* (quoting *Saunders*, 501 F.3d at 392). With regard to the second prong of the inquiry, the Supreme Court has set forth five considerations: (1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated when making the identification; and (5) the time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997).

Courts have found photographic arrays that contained six photographs or presented without being double-blind to not be impermissibly suggestive. *See, e.g.*, *Saint Louis*, 889 F.3d at 152-53 (holding array consisting of defendant's photograph and "five filler photos" was not impermissibly suggestive even though defendant's photograph was dark and blurry and was taken from a rap poster previously shown to the witness and where defendant's photograph did not "look 'strikingly different' from the five filler photos in a way that would implicate due process concerns."); *United States v. Coker*, 39 F. App'x 939, 940 (4th Cir. 2002) (finding array of six photographs not impermissibly suggestive); *United States v. Taylor*, 19 F. App'x 62, 64 (4th Cir. 2001) (same); *United States v. Spriggs*, No. CRIM WDQ-09-0361, 2010 WL 917709, at *3 (D. Md. Mar. 10, 2010) (finding procedure not impermissibly suggestive where witness was shown "standard six-picture array"); *Hope v. Kenworthy*, No. 5:09-HC-2121-D, 2011 WL 5599268, at *6-8 (E.D.N.C. Nov. 17, 2011) (rejecting habeas petitioner's argument that photo identification was impermissibly suggestive due to failure to use double-blind procedure); *United States v. Steele*, No. 1:14-CR-0147-WBH, 2015 WL 5089611, at *5 (N.D. Ga. Aug. 27, 2015) ("[J]ust because a double-blind procedure may be more accurate and reliable according to current scientific literature, it does not

follow that non-double-blind procedures constitute unduly suggestive procedures for the purposes of the Due Process Clause.").

Either of the two law enforcement officers that conducted the photographic array can testify at sentencing regarding when the photographic array was conducted, the procedures employed, the instructions provided to the eyewitness, and what the witness said or did in response to reviewing the photographic array and selecting the Defendant's photograph in the array. Such testimony—as would typically be presented by the Government at a suppression hearing—is sufficient to satisfy the Due Process requirement regarding the propriety of the photographic array that was administered. Similar to a suppression hearing, "the Confrontation Clause does not apply at sentencing." *United States v. Youngblood*, 719 F. App'x 195, 196 (4th Cir. 2018). Additionally, due process merely "requires that sentencing courts rely only on evidence with some minimal level of reliability" and the Fourth Circuit has rejected the argument "that without cross-examination evidence can never be reliable enough to use at sentencing." *Id.* at 197 (quotations omitted).

Additionally, even if the Defendant could satisfy the threshold requirement of showing that the array was impermissibly suggestive—and he has made no attempt to show this—the identification was nevertheless reliable. The teller had the opportunity to observe the Defendant through a lengthy interaction that was detailed by the teller to law enforcement after the theft. (Ex. 1.) The teller's detailed description of the Defendant's attire and appearance demonstrates the length of the interaction and the accuracy of the prior description. The Defendant approached the teller and asked for a change of address card, went around the corner to fill out the card, told the teller he was not going to complete the card because he lacked a second form of identification and declined to use his vehicle registration, purchased a postal money order with the exact change of

$21.35 and with serial number 25890043072,[2] asked the teller to check the back of the store for moving boxes, and then left the post office by the time the teller could return. (Ex. 1 at 1-2.) The teller identified the Defendant in the array two days after the Defendant's robbery. The teller's statements (as written down on the photographic array form) of "him" and "that's him #4" show the teller's high level of certainty. (ECF No. 45-1 (Ex. 3) at 3.)

Based on the above, the Government submits that testimony from one of the law enforcement officers who administered the photographic array is sufficient to satisfy the Due Process requirement and the minimal level of reliability required by the Fourth Circuit at sentencing. *See Youngblood*, 719 F. App'x at 197 (stating that the "mere fact that [the defendant] has not had the opportunity to cross-examine the victim does not render her statement unreliable" and that "police reports and [the defendant's] prior conduct also corroborated the victim's statement.")

### III. The Defendant's Medical Records Disprove his Claims Regarding the Effects of his COVID-19 Infection

The Defendant's statements in his declaration and in the PSR regarding the effects of his COVID-19 infection are inconsistent with his medical records. On July 17, 2020, the Defendant was tested for COVID-19 after his cellmate complained of COVID-19 symptoms. The test result showed that the Defendant had not contracted COVID-19. (Ex. 31 at 45.) Following this, though the Defendant told healthcare providers that he had "bodyaches and chills" for three days on January 21, 2021, the day prior to this medical visit the Defendant denied any such symptoms.

---

[2] As noted in the Government's sentencing memorandum, this money order—purchased from the White Marsh Post Office when the Defendant stole the blank postal money orders—was recovered from the Defendant's jacket seized from the Gwynn Oak, Maryland, residence. (*Compare* Ex. 1 *with* ECF No. 44-4 (Ex. 4).) The Government submits that this alone is sufficient to establish by a preponderance of the evidence that the Defendant was the individual who stole the blank postal money orders from the White Marsh Post Office on December 3, 2019.

(*Compare* Ex. 31 at 41 *with* ECF No. 44-5 ¶ 4; PSR ¶ 132.)  The Defendant was confirmed to have COVID-19 on January 22, 2021; however, the Defendant denied having "chest pain, head ache, [shortness of breath], fever, chills, cough, muscle ache, or loss [of] taste or smell." (*Id.* at 35.) The Defendant continued to deny feeling any such symptoms on January 23, 2021. (*Id.* at 33.) The Defendant was found "asymptomatic" on January 24, 2021, which continued until the Defendant was released from isolation. (*Id.* at 3-29.) The numerous notes in the Defendant's medical file while he was in quarantine dispute the Defendant's assertion that he was allegedly never asked about his symptoms. (*Compare* Ex. 30 at 3-35 *with* ECF No. 44-5 ¶ 11.)

These facts demonstrate the Defendant's at best inconsistent statements regarding the effects of COVID-19 on him, mitigating any consideration that COVID-19 had on the Defendant's incarceration or the sentence the Defendant should receive for his serious and lengthy criminal conduct. Additionally, the Defendant chose to flee from law enforcement during the pandemic, hide in Dallas, and continue his crime spree while he was on the run. Once he was apprehended by the U.S. Marshals, the only available option under the Bail Reform Act to ensure the Defendant's appearance at future proceedings in this matter was detention—as then U.S. Magistrate Judge Boardman found. Like every recidivist choice the Defendant has made that has brought him before this Court for sentencing—resulting in a Criminal History Category VI—the Defendant has only himself to blame for his detention through the pendency of this case and during a global pandemic.

### IV.     Restitution

Since filing its sentencing memorandum, the Government has received additional victim impact statements and actual loss claims from Navy Federal Credit Union (for $2,758.53) and Metro Medical Credit Union (for $1,136.53). (Ex. Nos. 32, 33.) Along with the actual losses

claimed by Bank of America ($54,526.87) and PNC Bank ($73,345.32), (ECF Nos. 45-7, 45-15), the Government requests that the Court order restitution in the amount of $131,767.25.

## CONCLUSION

The Defendant is a career criminal who has been given every opportunity to turn away from recidivism and choose a law-abiding path.  A sentence of 24 months as recommended by the Defendant will only embolden him—demonstrating that his serious crimes will not be met with serious consequences and a just punishment.  Having chosen to escalate his crimes at each opportunity, for the foregoing reasons, those presented in the Government's sentencing memorandum, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of **87 months in prison, followed by 5 years of supervised release**, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:   \_\_\_\_/s/_____
Rajeev R. Raghavan
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on September 14, 2021, and thus served upon defense counsel.

/s/
Rajeev R. Raghavan
Assistant United States Attorney